I'm going to ask you about the material that was submitted, but I'll do it after, you know, we get going. So, Mr. Brandt, you're up first. I know that you filed or somebody filed motions wanting additional time and so on and so forth, but we did not that we think you can get through the issues sufficiently. We've read the briefs fully in it. It's a huge record and big briefs, but we have read them, so we know what the case is about, so your time is best spent if you drill in on the most salient issues. Thank you, Your Honor. May it please the Court. Counsel Jeff Brandt for Linda Bolton. Excuse me. Ms. Bolton has challenged all five of her convictions in her sentence. We believe she's been wrongly convicted as a result of insufficient evidence, a violation of her right to confrontation, the withholding of material exculpatory and impeachment evidence, and then wrongly sentenced as a result of a lack of evidence allowing the district court to reasonably estimate, and that's obviously the standard for loss, reasonably estimate that loss. Count six charged Ms. Bolton with willfully signing a false tax return for the 2009. She wrote loans on checks for that year totaling around 14 to 16,000. Leading up to trial, there was a question on whether the government would rely on writing loans on these checks to prove that something was false in the 2009 return, but at trial, the government's witnesses, Accountant Renee Moore and Agent Luker, made clear that the government was not relying on those checks. Instead, the government's case as to count six, tax year 2009, was based upon cashed checks. But the testimony about cashed checks coming from Agent Luker established that, quote, most of them were endorsed by Charles Bolton, and the government was unable to tell the jury who the other three were endorsed by. So there's zero evidence that Ms. Bolton signed any check over to cash as for 2009, leaving the only evidence as to Mr. Bolton, and again, it's only about the cashed checks, not about any loans when it comes to 2009, and that's our argument that count six has to be reversed. As to count six through ten, among a couple of arguments, Ms. Bolton reasonably relied on a tax professional and had no reason to believe the accounting firm was reporting things falsely. The testimony, especially of Renee Moore, but also Agent Luker here again, established that Ms. Bolton wrote the word loan on items and submitted them, and in 2009, the accounting firm, the Nicholson firm, treated them properly as income. All of this argument was very vociferously made in closing argument to the jury. Yes. And then the jury returned a particularized verdict. So the notion that she was never told by them and never explained to them, that was fully presented to this jury. And obviously, we understand that the jury verdict went against Ms. Bolton, but our argument is that it takes an inference upon an inference to get to the point of finding that she's willfully signing the document knowing it's false if no one's ever approaching her and saying, when you write loan, what do you mean by loan? Do you know loan makes us do X or Y? I think it's particularly salient that no one approached her between 2009 and 2010 to say, you know what, we're completely changing our practice. You used to give us something that said loan, and we treated it as what it was, income. What was the name of the accountant before Renee that she claimed had said? Ms. Bolton stated at sentencing that it was a male, and she could not remember his name. The government's case did not present the name of that person. So the record shows that it was a male at that accounting firm for 2009, and that switched out to Ms. Moore in 2010, but we never learned the name of that. Besides sufficiency, what legal error do you identify? Well, assuming sufficiency, we'd first argue that her confrontation clause right was violated when the government presented the testimonial statement of attorney John Lee through Agent Luker. The government's two arguments before getting to the merits, and I respectfully submit that's because we have a really good merits argument here, is that plain error applies and that we've somehow waived this argument. Plain error does not apply because this argument, I mean, plain error, and this court is leading when it comes to making clear when plain error should not apply. If the district court has had a chance to look at the legal issue and rules on it, we're not trying to take, you know, surprise the court of appeals or get a second bite at the apple. But the government here adhered to the district court's explicit instruction, don't go there. It was the defense counsel that decided to go there for what appears like a tactical approach, which was defense theory is missing Mr. Lee is the one that's really guilty here, and the ledger is what's incriminating us, but you can't believe Lee. So the defense wanted to get it out, they asked to get it out, and therefore how can you not see that as waiver? We submit that it was not Ms. Bolton's attorney that wished that to be the case. So you accept Sobalos and Stevens, but your position is as a co-defendant you're not bound to it, and yet the statements at bar implied that your, I don't know if it was you, that counsel was in accord with this attack on Lee. It was not me, but I believe the context of that question shows that the attorney is trying to clarify what the court's ruling is. Remember, the district court was asked to rule on this question looked like he was going to go and allow the evidence in, took a break, and came back from the break, and then they were still back and forth. The judge made a ruling, and Ms. Bolton's attorney said, so that evidence is going to be allowed, right? Is that the ruling? But clearly the attorney nor Ms. Bolton did not dissent or object. At that moment, I have to say that's true. Not at that moment, but I think it's still not plain error because of the two, and then the post-judgment. We also submit that material evidence was withheld. I see that the district court and the government want this court to focus on suppressed, but as I've cited, there's the Cessa case that says suppressed, but there's the Lanier case and the Infante case that say this is about withholding. You didn't get the 302 behind the PSR as Jenks? We did not. That's not disputed. That's correct. We didn't get it. So it's that paragraph in the PSR you say contains Brady error. That's correct. And yet that full paragraph is pretty incriminating because it says Lee said, I didn't even ask him questions. I just gave him money. And yet we didn't have the opportunity to cross-examine anyone or even Agent Luker based upon that document to show that a statement that Mr. Lee says all $273,000, all of it, all of it for sure is food and services, yet we have a document that says I'm not even sure, and I give loans out to people, and I'm generous, and Mr. Bolton's a good friend of mine. I wouldn't have given him money for anything. I see my time is up for my seven minutes. Thank you, Your Honors. All right. Well, you've saved time for a vote. Thank you. Yes. Thank you. Mr. Bates. Were you trial counsel? No, sir. No, Your Honor. Both of you are appellate counsel, right? Yes, Your Honor. Got you. Go ahead. Yes, if I may please the court. My name is Ivan Bates. I represent Mr. Charles Bolton. For over 40 years of law enforcement with no criminal record, Mr. Bolton's now sitting in jail based on not only hearsay evidence, but he's sitting in jail based on the evidence from an individual who's now been convicted of filing a false tax return. It's that information that the government used to convict Mr. Bolton. We recognize this case is built on 80 percent of the checks from Mr. John Lee. The question is, where are the checks from, and what were they really for? Now, the government, how they proved this. One, we say they proved it through the hearsay testimony of John Lee, because we know John Lee never testified in the case, but Agent Luker did. Now, we do recognize the argument that Mr. Bolton's trial counsel allowed the hearsay, but we actually moved back before then, because it was directed by the court to have the hearsay. And what do I mean by that? There was a bench conference in which the court says, and Agent Luker's questioning what he can and cannot say, trying to understand the lay of the The agent's kind of looking at the judge, and he says, go ahead. He says, Lee told me the checks were for food and liquor. At that moment in time, instead of the court saying, no, that's not what we mean, that's hearsay. The court says, continue to go ahead. Even AUSA Harper says, and where are they purchased from? At that moment in time, the hearsay is already, they're saying this is what we need to do and move in that direction. Of course, Mr. Owens' trial counsel even does object. They sit down and ask the questions. We would sit down and say, this is a situation where Mr. Owens had to defend his client. There was never going to be a, Mr. Lee was ever going to testify. There was no Rule 104 hearing. Once this information was going to come out, the bell had already been rung. We would ask that this court overturn based on that particular bell being rung with the hearsay. You accept the law that governs is Sobolos and Stevens? Stevens, yes, but Sobolos is different, because to me, what Sobolos looked at, the defense never filed a reply in reference to, hey, this is really what happened. There never was a waiver, and so that's why I view Sobolos different in this case. We also see we have a Brady violation. Not only did the government at one time focus on John Lee as well as Mr. Bolton, the government then begins to have an investigation into John Lee, and we know this investigation took place in March of 2015, and once again, the government didn't provide the 302s. They were suppressed, and it was the information we say was favorable. But yes, there was a small segment in there, but it was very favorable because what the defense attorney could have done with 302 is looked at it to find out, is there an investigation? What other information is possible? But you knew there was an investigation. He knew that there was a question. Your whole closing argument was built on the fact that Lee's being investigated, ladies and gentlemen. He's the guilty one, not these guys. Well, it was, but it also has the opportunity to have more information if we received it during the- The more information is that he said, I can't identify which check goes where. Exactly. But in the PSR, he said that because they showed him a spreadsheet. The sentence before says, I'm looking at your spreadsheet. I don't know. How is that inconsistent with anything Agent Luker testified to? Well, it's inconsistent because Agent Luker, one, is only listening to John Lee. We now know that John Lee lied. He's perjured himself and what particular checks- Let me rephrase the question. What testimony did Agent Luker give, quote it verbatim, that that PSR paragraph would be in any way inconsistent with? He said all the checks were for liquor as well as food. All the checks means all the money at that moment of time was for liquor and food, and you could have the impeachment with that 302, Your Honor. But the- Well, stop. We don't know the 302. It's not in the record. Yes, we don't know. It's not in the record. We're focusing on that paragraph in the PSR. Yes. What he apparently said in the interview to the IRS and the FBI is, I can't tell which check goes where. That doesn't rebut a statement that he did then give all the money for food and supplies. Well, he says that, but he also says in the 302 that he does not necessarily know he could have written the checks for loans for Mr. Bolton. It's so confusing. Slow down. The PSR paragraph says he could have written for loans. I thought the PSR paragraph said the opposite. It says that he would not be shocked if he had written a check for loan, or if Charles Bolton had asked for a loan, he would have given it to him. I think it's what the PSR says. All right. However, in looking at that, Your Honor, we do not necessarily, that would have given the opportunity for defense counsel to follow up with an investigation in so many other ways, so many directions. We do recognize that this information was material, but the court did not give the correct standard test for materiality. That is really big, and now the government has even said, hey, let's send it back. We can't send it back. The reason we can't send it back, unlike before now, we know that John, that Mr. Lee has a conviction for tax fraud. You said it was an objection to the charge given about materiality? Is that what you're saying? What I'm saying is that when they gave the, they never got there in terms of the analysis. The court sat down and said, is it more likely or not that this would lead to the conviction being overturned, which we know is the wrong standard. And at that moment in time, Your Honor, when you look at that, it didn't even do the proper analysis. Because it didn't do the proper analysis, even the government has admitted in their brief that it has to at least go back. We're arguing that it cannot go back, because now we're in a totally different position. Because before, in looking at the issue in reference to materiality, it was only the 302s. Now we have the information of Mr. Lee having a conviction. So we cannot go back and look at the materiality issue in reference to the Brady violation. You have an ineffectiveness argument. You're not pursuing that here. Yes, we will. Am I correct that your client handed the checks from Lee to Mr. Owen? So he knew that Lee was paying for his representation. Is that correct? My understanding, it was the account that gave the check to Mr. Charles Bolton. Does the record show that Bolton handed Owen the checks from Lee? I am not concerned about that, Your Honor. I don't have to rely on the record. I apologize. Now, ordinarily, we don't address an ineffective assistance counselor claim on a direct appeal. Typically, if we get those, it's on habeas. Is your statement to us that this should be an exception or set another way that this record is so complete that there's reason to look at that issue in this context as opposed to the way we normally might address an ineffective assistance counselor claim? Yes, I think this is so outrageous in terms of having a defensive counselor merely move over and file a brief or a petition in which it's now taking the exact opposite approach to its client. Because of that, I think this is something we'd ask the court to address and look at. Thank you. All right. Thank you. All right. Ms. Copes? I know you have your argument outlined, which you're going to say, particularly with respect to, you know, sufficient and so forth, but the confrontation issues and the Brady issues among the whole panorama there, just make sure in your presentation that you clarify, hit those issues before you run out of time. Yes, Your Honor. Thank you, Chief Judge, and may it please the court. Diane Copes and Ryan McLaren and Kevin Boitman on behalf of the government. And despite the reams of paper that you've seen, the defendants have not presented reversible error. You have two owners of a restaurant and a liquor store who chose to evade their taxes by underreporting their income. And they did it in two ways, the checks and the loans. And first was, I believe, sufficiency, Your Honor. The evidence was more than sufficient as to both defendants. Linda Bolton has raised this in particular. She argues that... There were Allen charges, right? So this was a hard case for the jury? There were Allen charges, and the jury asked a question about willfulness. And I wanted to clarify that. I'm not sure our brief says what happened after that. But immediately after the jury asked about willfulness, the judge read the willfulness instruction and the two substantive instructions. These are 13, 14, and 15. He talked to counsel, and he told the jury to reread those. He told them to read those again. That's at 2766 of the record. So they heard willfulness in three different instructions. They didn't just hear that it's a crime to obey the law. What about Ms. Bolton's focus on count six? Is it easy to point to record evidence supporting that particular count? Ms. Bolton wrote and signed some of the checks. And that she didn't do it in 2009 doesn't mean she didn't know about it. I mean, she was signing checks herself throughout the course of the tax evasion crimes. And the jury, with a joint tax return, could infer that she knew there was cash coming in from the checks and that the use of cashing out checks and then just taking the cash and running with it was part of the pattern, the consistent pattern over the years. The jury could also infer that the reason she didn't get money from the loans in 2009 was because she didn't get away with it. She did write loans by customer checks for liquor from the liquor store and food from the restaurant. She just didn't get away with it that year. And that year, the Boltons had to pay taxes. The following years, when she did get away with it, they got refunds. So those were all jury calls, as Your Honor pointed out. And the jury heard all of the evidence against Ms. Bolton. And the jury could use its common sense to infer when you're cashing checks for cash and you're writing loan next to tallies you're giving to your CPA, you're trying to avoid paying income tax by turning the checks in the cash before it hit the books. And by marking customer checks as loans. And we had five witnesses testify that they didn't lend Boltons money. They bought liquor from the liquor store and food from the restaurant. So there was a lot of strong evidence on the loans. And the cashing of checks itself is pretty strong evidence, as the district court recognized, in denying acquittal at the close of the government's evidence. Most honest businesses, with the exception of some not at issue here, don't deal in large amounts of cash. And they don't have a pattern of underreporting. And they don't do the various other, like surreptitiously relying on large amounts of cash. And here, they didn't just use the cash they had on hand. They actually cashed checks, turned them into cash, and then we don't know what happened to it, and that's the whole point of cash. At least three of their legal arguments for error turn on Mr. Lee. And one is, well, Lee wasn't there. He was going to take the fifth. He later pleads guilty. But somehow, his statements come in. So confrontation cause violation. Or somehow, his statements get misconstrued, and we don't know about it. Brady violation. And then also, Lee is behind their ineffectiveness argument. Because their claim is that he's working with the government, but at the same time, he's paying for the trial attorneys. So trial attorneys have a conflict, and they're ineffective. So Lee's role is sort of central to most of their arguments that the district court mishandled how to resolve that. I'll allow you to- You may have to remind me. Well, here's the question then. I guess the one that concerns me most is the ineffectiveness one. So do you agree that since there were new trial proceedings on this, the issue was presented to us? Ineffectiveness, the record is complete. This shouldn't be pushed off the habeas. You haven't argued that in your brief, have you? There's no evidentiary hearing and the other typical things that happen with ineffective assistance claims if they get beyond the pleading stage. There were a lot of allegations that the Boltons made. Their attorney responded- But have you asked us to not address it because it's properly raised in habeas? Is that in the government's brief? In our brief, we say that the ineffective assistance of counsel should wait for another day in another venue. And by that- The way they argue it, though, isn't it intertwined with their whole arguments about, as Judge Higginson said, this one witness? Well, let me just clarify a few things about John Lee. He wasn't a government witness. In fact, at sentencing, Charles Bolton got up and under oath, he said that he had been meeting with John Lee up until the very day of trial, and that's at 2860 of the record. So in terms of Brady, since he's meeting with the person who made the statement, as he said at 2860, one would think that he could divine with some diligence what the statement was. We also agree with Judge Higginson that there's not a lot in there that could even be with a lot of imagination construed as helpful to them. And there's a whole lot in that statement that is very helpful to the government. And so you can't really fault the AUSAs for seeing all that really helpful stuff and not making the mental contortions that are necessary. In order to find something positive for the defense in there. But the biggest thing is John Lee was thoroughly impeached and he wasn't a witness. What we did is we used the business ledgers and we got those from his firm, not from him. And the business ledgers themselves were thoroughly impeached in the sense that the government asked about John Lee being under investigation, the defense asked about John Lee being under investigation, the jury was told that he exercised his Fifth Amendment privilege not to testify, and the court allowed the defense attorneys to comment on his failure to testify based on his Fifth Amendment right. And the jury also heard that John Lee was using business deductions, which as far as the Boltons were at issue here, he was using business deductions to pay for $25,000 worth of jewelry from Adler's, a fine store here. On the ineffectiveness, their argument was we've got newly discovered evidence that our attorney, Owen, had a conflict because he was being paid by the guy that the government gets a guilty plea with. That's the essence of the argument. And your answer to that, is it true that Charles Bolton was the one that was handing the checks? That was the question I was asking opposing counsel. At page 2124 of the record, you will see that Charles, and then this is the court's new trial order, the court goes to great detail about what happened in 2014 with the food theft case. And the court says, you know, looking at all these documents, I find Charles Bolton brought the check from Lee and the check to Nicholson by himself with no one else over to Owen in 2014. And to all of a sudden claim that he just discovered this as of April and May 2017, the district court found that a little hard to believe. And so that's, as far as the conflict of interest, he knew from the get-go, he might have held this out and sandbagged with it, but he knew from the get-go that John Lee was paid to represent him in the... And he also knew Lee was under investigation. He did. And that's why he took the fifth, you know, later on in this case. And another buddy of theirs, Carl Nicholson, was also at the hearing, I'm sorry, the interview where the 302 was generated, and he could have reported that to Charles Bolton as well, because they continued to be friends, and he wrote a favorable affidavit afterwards. He's since been indicted. So, I hope I addressed your three Lee issues. A lot of the arguments that counsel makes are jury calls. I guess the one, the confrontation clause as to Ms. Bolton, would Sabalos and Stevens apply to a co-defendant? Do you understand my question? I do. I haven't found a case, but I don't think that you need to reach that, because, well, we interpret her counsel statement as to Charles Bolton's asking the hearsay question as encouraging it. He says, he can ask the question, Luker. He can ask that, right? We read that differently. But whether you read it the way Linda Bolton does, or the way we read it, it's not an objection. Her lawyer did not object and was, you know, asking, can't he do it? What was the defense tactic to get this out? It was clever. What was the defense that then, in closing, they embellish on by virtue of having elicited that from Luker? Well, their theory was, it's not believable that $274,000 is spent on food and liquor. And they, after asking the question about the $273,000, Charles Bolton's counsel said, that's a whole lot of ribs. Now isn't that? So they were using that to impeach the ledgers and the documents that we had from John Lee. And they did so pretty thoroughly. And it became a jury call at that point. So I just want to point out that there's been some confusion that Charles Bolton did ask the hearsay question. The government had been shut down on that earlier. And the defendants got the ruling they wanted. And that was that it doesn't come in. And then the defense argued to bring it in. And like I said, Linda Bolton's counsel did not object. Whatever he was saying, it was not an objection. So with that, if there are no further questions. Let me ask you, counsel opposite for Mr. Bolton argued that the court, it may have been Mrs. Bolton, in other words, that the judge made some oral misstatements, I guess, of the jury charge. My recollection is he was talking about materiality. In the briefs, it may allude to something else. So my question was, does the government acknowledge that that occurred? If so, was it cured by the written instructions? Exactly what will the record tell us about that? We do believe it was cured not only by the written instructions, but even by the instructions. That he was giving orally to the jury. Because number 13 is the general willfulness instruction. And he did say it's a crime to obey the law, basically. Which would seem nonsensical. And I have seen writings that say if something just makes no sense whatsoever, you don't have to say that the jury believed it. But the other two things, right after he said 13, which was the definition of willfulness, he gave the two substantive instructions, tax evasion, and then 7206-1. And when he did that, those also incorporate definitions of willfulness. They say intentional violation of a known legal duty, the cheek standard. And then he gave the written instructions to the jury. And the jury asked a question about willfulness. And immediately after that, he met with counsel. And he told the jury to go back and reread instructions 13, which is willfulness, 14, tax evasion, and 15, both of those also having definitions of willfulness in them. You'll find that at page 2766. The written instructions are at 7309 and thereafter. And when the jury is told go back and reread these, when the jury is told go back to reread the instructions, that would cure any problem with telling them that it's a crime to obey the law, which was a slip of the tongue, a transcription error. I mean, nobody would say that on purpose. I wanted to mention materiality in the Brady context. And the district court, in its order, and that's around page 371 of the record, on Brady, at first states the wrong test, that it must result in a quill to be material. But then later in the opinion, he cites, he doesn't cite SES, he cites Bagley, but said the same standard that was used in SES and Bagley, and that is a reasonable probability of a different result that would call into question the integrity or confidence in the verdict, the Kyle standard. So he has both of those in there. Under any standard, and this is the 302 was not material, but we did want to point out to you that there was that instance where he did misstate the standard at the beginning of that particular order, although he got it correct later. But regardless, the 302 is immaterial, the PSR is immaterial. It's just very helpful to the government and not helpful to the defense. I'd like to ask you two minor questions. One, if you'll touch on the claim of prosecutorial misconduct, and the other is, does the government concede that the judgment on when restitution must start needs to be corrected? Yes. In our brief, we asked the court to do as it did in Westbrook as to restitution, Your Honor, and the restitution in tax cases is limited. It's either by agreement or it's as a condition of supervised release. The judge said correctly that restitution was a condition of supervised release, but he said that it would start immediately and the Boltons were going to jail first. And so the order needs to be modified, and this court can do that as in Westbrook, to say that restitution doesn't start immediately, but it starts at the beginning of the supervised release term. And I'm sorry, Your Honor, prosecutorial misconduct, of course. The arguments that the defense criticizes are typical closing argument. There's nothing that is— What about telling a jury to look it up on Google? Ms. Lieberman didn't tell them that. She said—she was talking about the testimony of the Air National Guard sergeant who didn't know what a capital contribution was, and she said he said he didn't know he would have to look it up, you know, like he would look it up on Google. She didn't tell the jury to do it. She was just saying, for an example, the sergeant could look it up on Google, and when you read that in context, you can see that. And the jury was instructed with the standard Fifth Circuit pattern instructions, including consider only the evidence, don't consider arguments, don't consider anything outside the record that's presented to you here. Are all the government misstatement arguments subject to plain error, or did they make a contemporaneous objection or object after closing? They didn't object contemporaneously. I cannot tell you, given the volume of the new trial motions, I can't—I can't recall whether they raised that objection in their new trial motions because they were about this high. And—but that doesn't preserve error that you should have raised at the time, and they didn't raise it at the time. All government misconduct allegations they're making subject to plain error except the Brady one, which they did object to when they got the material. Is that fair? Yes, Your Honor. Okay. As—as well as I can recall. There were so many things that we had to respond to in this case, and I don't have a perfect memory, but there was one other thing, Judge Wiener, that you asked about, oh, the prosecutorial misconduct. One of the things that was a little confounding in this case was the use of the record, and one particular place in the prosecutorial misconduct allegations, there's a block quote where they're block quoting the government counsel. And he was asking a series of rhetoric questions, which he's known to do. You know, do you believe—you know, do you believe Rene Moore? You got to believe this in order to do that. And they were questions. And in the brief, they substituted bracketed periods for those question marks so that they became, you have to believe, Rene, you have to believe that, you know, the very opposite of what he was suggesting. He was asking questions, you know, about how can you throw all this out, and they substituted periods to make those affirmative statements, and they're not, and that concerns me. There were other things that concerns me as well. But as we argue in our briefs, the prosecutorial misconduct claims are, well, at least, to the very least, incorrect, and then sometimes pretty disturbing that they were argued in the way they were by the defense. All right. You presented to the panel this sealed ex parte motion to provide this sealed grand jury material. Your Honor— Hold on. I'm sorry, Your Honor. I'm under 6E on that. I'm worried about—I gave that to answer. I'm so sorry to interrupt you, Your Honor, but I'm terrified— I am, too. I'm typically used to people letting me ask my question before they cut me off or start to answer the question. I'm afraid of committing a 6E violation. Well, I'm afraid you're going to be in worse jeopardy than that if I don't get my question out, because you're the government, and you're here representing the United States, okay? Hold on to what you got. I'm so sorry. Don't be sorry. Just hold on.  You provided, you, the United States of America, provided an ex parte sealed motion to provide sealed grand jury material to the three-judge panel. It says that it's for the purpose of extricating you from any rule violation that you, the government, might otherwise be under because you were searching for documents and ultimately found them. So is this presented to us for the purpose of putting on the record that you were purging yourself from some ostensible rule error and not for any purpose germane to the issues that are appealed in this case? Your Honor, we didn't violate the rules. I didn't say you did. I'm asking, is this presented as anything probative to the issues appealed to us or merely putting on the record that you've done your due diligence, found these documents, and want it to be said that you didn't violate the rule? When we responded to Charles Bolton's motion to supplement the record, he took what appeared to be a grand jury request and he slapped some documents behind it. And we didn't know where they came from at the time because we had to answer very quickly. But we told the court that we would engage in further review. I got that part. For what purpose do I and the three of us have these papers? To follow up on what we said in our opposition to supplementation in order to demonstrate that what was attached was not correct in the supplemented documents by the defendants. Okay. So assuming I take you at your word that that's true, why do we need to look at these? Because I wanted to follow up. I told the court I would look. I wanted to tell you what I found. You're an officer of the court. You certified that that's true. So if that's true, my point is, is anything in here germane for us to look at as relates to the issues that are on appeal? It's germane to the subpoena to Carl Nicholson. The subpoena itself is in the John Lee investigation. That subpoena, Carl Nicholson took the fifth. These documents, and he didn't provide the documents that are attached. Those are not an answer to Carl Nicholson's subpoena, although the defense suggested it was in combining those into an exhibit with a subpoena on top and calling it the Carl Nicholson subpoena. That's not right. And because that's not right, I felt like I had a duty when I said I would keep looking to figure out where the government got them to correct that. And I tried to do it in a way that didn't violate my duties. And the reason, Your Honor, I so apologize for having cut you off, but I'm to this day worried about 60 violations with those materials. Thank you, counsel. I have your answer. Thank you very much. I just jumped, Your Honor, because of the worry of mine. All right. Mr. Brandt, we're back to you with your vote, sir. Thank you again, Your Honors. As to count six, in response to Your Honor's question, I heard the government's attorney use the word they a lot, not Ms. Linda Bolton. And I heard the government's counsel say, you, you are cashing checks. They are calling checks something. The problem is there's no evidence upon which a reasonable inference can be made that Ms. Bolton knows about those cashed checks, because the checks are cashed by Mr. Bolton and three are unknown. Upon what shall we infer that she knows about them? Because they're married? We can't do that. That'd be awful precedent. Because she wrote loans on checks we've established, and the record establishes that she's done that in a way that the accounting firm still understands that those are taxable income. And they don't change that until a year later and do not tell Ms. Bolton. I think, yeah, the government can respond and talk about the Mannheim and the Lee checks from 2009. That's government's Exhibit 75. But none of that shows that Ms. Bolton willfully signed 2009's tax return knowing anything in there was wrong. There's no evidence that she got the cash. The cash went from Mr. Bolton to her.  As to confrontation, and whether this is an objection or a waiver, I thought I heard government's counsel suggest that not objecting is equal to acquiescing in a constitutional violation. Not objecting may mean that there's a plain error review. But not objecting does not mean a waiver of a constitutional right. It's an attorney failing to stand up again and say,  We urge the court to not review for plain error. But even if it is plain error, we believe plain error is shown. But it's certainly not an argument that's been waived. And as to the FBI 302, the government's reliance on the fact that Carl Nicholson was in the meeting with Attorney John Lee, the district court relied upon that as well. But there's no way that Ms. Bolton has the burden to interview an accountant who she doesn't even know was in a meeting and pepper him. Once you saw that paragraph in the PSR, did you make any effort to request that the 302 be placed in the record? Yes, that was a motion. So the 302 is in the record? No, we requested it. The former counsel requested that that be placed in the record, and it was not. And it was not, but that's not an issue you're bringing up on appeal. No, no. Thank you. All right, thank you, sir. Mr. Bates. Thank you, Your Honor. Looking at the prosecutorial misconduct, the government has a continuous duty to disclose exculpatory evidence. On June 17, 2017, the day that the government filed its motion to reply to the motion for a grant to new trial, was the same day that John Lee, in fact, signed his plea agreement. That was never turned over to the defense that was actually sealed. We also sit and look at the, once again, the 302s are not in the record. One of the things we want to talk about is the efficiency of the evidence. When we look at... With your first statement, what do you mean they didn't turn over what? The plea agreement? The plea agreement. That was placed under seal. Right, but they wouldn't have had a plea agreement at the time of trial. How could they have turned that over? Well, the motion for new trial. And so you still have the continuing duty to disclose. And the motion for new trial, then the defense has that, we can sit down and say, Your Honor, this is newly discovered information and evidence based on the newly discovered evidence and information John Lee has talked about in his guilty plea, counts 4, 5, 9, and 10 of Mr. Bolton's being found guilty. He said in the oath that he filed fake tax returns. So the question is, now we have to sit back and look at the ledges and all the other information based on the John Lee tax return, guilty plea, Your Honor. And so that's one of the ways I think the defense would have also been able to bolster the motion for new trial. That information was never given. It was suppressed by the government on that particular day. And looking at the evasion issue under 7201. One is their tax deficiency. Mr. Bolton has never, ever received information from the government ever that he had any tax deficiency. Even the government's own briefs doesn't talk about that. Were there affirmative acts? Cashing checks is not illegal. Deceptive tax records. Agent Luker at 2580 said that Charles Bolton didn't have deceptive tax records. What about the false statements? Well, where are the false statements? No one's ever talked about the false statements attributed to actually Mr. Bolton. What about the good faith? Was it willful? Well, Mr. Bolton amended two tax returns, 2009 and 2010. And he also hired accountants. So when we sit down and we look at that in terms of counts one through five, we ask the court to strike that. However, we also sit down and look at unfairly combining elements of perjury. 7206. Do you agree, just because time's running out, on the restitution point with our precedent, that the remedy would be to modify the judgment rather than vacate and remand? We would always ask for vacation and remand, Your Honor. But how do you distinguish the Westbrooks decision then? There really is no distinction, Your Honor. When we sit and look at the fairly referenced evidence and the elements, Your Honor, they've combined the two. Here we clearly see the jury instruction. We've combined 7206 with the 7201. We would argue that when it knocks out all the 7201, therefore, it must knock out all the 7206 following the false tax return. We would ask the court to, in fact, dismiss counts two through ten and to immediately release Mr. Charles Bolton. Thank you. All right. Thank you, counsel. Thank you, counsel, both sides. This is, it's a big record and lots of briefing. We've gone through it. We will go through the record and decide the case. Thank you.